First case for argument this morning, 1891 Northern Iowa, United States v. Josh Isler. Thank you. Mr. Suber, we're ready when you are. Thank you, your honor, and may it please the court. I would like to reserve five minutes for rebuttal. This court should vacate Mr. Isler's sentence and remand for resentencing if the was three years above Mr. Isler's guideline range of zero to six months. Now, there's a number of issues in this case, as I'm sure you can tell from the briefs, but I would like to focus on what we see as a threshold fundamental issue. That was the district court's incorrect conclusion that this was an unusual case that, quote, falls outside the normal type of case that we have when we have these types of trade secrets and confidential information. We disagree. I don't see how that descriptor can possibly be reversible error. I wrote that. It seems to me this case is the fundamental question is whether it's a substantively unreasonable variance because the loss was not capable of reasonably reasonable estimate. And I frankly don't see anything else worth much discussion. Okay, your honor. Well, I think I guess where it's a good place to start is, well, I think the issue is you said that the loss, I believe, was I couldn't quite hear you what you said, but what was the issue that you said was with the loss? You need to be closer to the mic, I think. Yes. Can you hear me now? A little better. Okay. Mr. Suber, I think the question was because the judge relied on the incalculable late nature of the loss that the question before us is there a substantively unreasonable variance because the judge used that as the basis for imposing the sentence that is a factor of times than the guideline range. If I fairly paraphrase Judge Loken's point. Yes, and I believe our position, your honor, is that just because there was not an incalculable loss in this case. There was a loss that Mr. Icewood stipulated to him. He stipulated that there was a loss of $5,000 at least. The government then failed to meet his burden to prove a loss beyond that. That does not make a case unusual. It doesn't make a case unreasonable. It doesn't make a case serious. Did they fail to prove a loss greater than $5,000 or just that the loss was indeterminate but well in excess of $5,000? Because Judge Reed apparently believed it was like in the many times the $5,000. And I agree that that is what Judge Reed believed, your honor, but there was no finding that the loss was above $5,000. It was her finding was that it was impossible to find with any degree of accuracy that there was a loss that was able to be calculated under $5,000. I think there was a finding that there was no loss that was above the $5,000 anchor, which was what Mr. Icewood stipulated to when he stipulated. Wait, wait. That would be a very different finding. No loss above $5,000 is different than a finding that there was loss above $5,000 that can't be reasonably estimated with precision. Yeah, so I take the point. I understand it. I think what I'm trying to get at is that the case here, for her to say that it was an incalculable loss, what our position is is that there was no explanation for what made this loss in this case so aggravating and such an unreasonable factor that this sentence needed to be increased by 600%. It cannot be the case that in a mine run case like this one that stealing trade secrets is quote unquote so serious that an increase of three years is necessary. Of course, the court would disagree with the guidelines, and it's our position that that's what she did here, because she said she doesn't see how this sentence could be calculated for black purposes using gain and loss figures. But if a court is going to deviate, they must explain with sufficiently compelling justification the deviation from the guidelines. And your Honor— Wait, I think that was departure language. We're talking about a variance. No, so from Gaul, Gaul applies to both departures and variances. Gaul also tells us not to mess with the district court's determinations. The Gaul—yes, yes, Your Honor, but the Gaul does not say that—in Kimbrough, for example, Your Honor, the court specifically said that when there's a variance in a mine run case, that that case, if there's a variance in a mine run case, it is necessarily based off a disagreement with the guidelines, and that those cases are subject—they must be subject to closer review. That is what we respectfully submit is definitely this case. This is a mine run case. Stealing trade secrets under the Defend Trade Secrets Act is a mine run typical case under the guidelines. Now, obviously, the guidelines are mandatory, and we're not arguing that that's the case. It is our position, however, that if the court is going to deviate from that, the court must provide a sufficiently compelling justification for doing so. The larger the deviation, it must be supported by moral justification. That is what the Supreme Court said in Gaul. And respectfully, Your Honor, we just do not see that justification here in this case whatsoever. If anything, we believe that this case was a case where the district court made a clear policy disagreement with the guidelines and masked that as an individualized determination under 3553A to reach the punishment she felt was appropriate since the government could not meet its burden under the guidelines. There were a couple things that she did say. She said that she didn't agree with the guidelines. She said that she thought that the misrepresentation in the course of the investigation, what would have been an 18 UFC 1001 violation, was significant and that that was worthy of some addition. And then she also said that the loss was huge and therefore you couldn't really ascertain the exact damage that was done or she felt that the loss was incalculable, but it was clearly implied it was large. And then she had this sort of scoff law theory that your client had 12 speeding tickets and was otherwise disrespectful to the law or something. And so those are what she's given. And I think that ultimately the issue that we're going to have to decide is whether it was substantively reasonable to go from what would have been a zero to six months range to 42 months when the high end of a guideline range violation under an 18 UFC 1001 would have been six months. There is no guideline range for speeding, but it's non-criminal traffic offenses. And so even if you gave 10 days for each one, then you're at 120 days and you'd start looking, okay, so now we're at two years and four months, then how do you get from there to 42? And is that, on this explanation, is it is it, is it well enough explained, right? I mean, yeah, I agree. I think our position is if we, if we step aside from the post-Booker variants, which we, you know, if you put those aside and just focus on substantive reasonableness, it's our position, and this is why we circulated the 28J letter earlier this week, it's our position that the over the reliance on Mr. Eisler's criminal history and all of the different, like you said, the speeding tickets and the convictions from when I was two years old that were unrelated to the case were not sufficiently aggravating under 35 they could be to make a sentence that was sufficient but not greater than necessary to punish Mr. Eisler before it got a mine run case. This was a mine run typical case. Well, you keep saying that, counsel, but I think I've been a judge for many, many years, and this is the first, the first theft of trade secrets criminal case, sentencing case I can remember. So when you say mine run, it's a mine, it's a mine of one right now as far as I'm concerned. Yeah, I understand. Well, the Seventh Circuit has actually addressed, looked at this, and we actually, I actually found a Third Circuit case last night, and they looked at these cases, and Judge Posner looked at this in another context, but basically the point is that in a mine run case, the government, the failure to, incalculable loss, which is what we're focusing on now, does not make, is not deserving of increased punishment. It just means that the district, the government did not earn the quote unquote bonus points of punishment that would justify increasing the sentence. It does not take a case out of the mine run. The mine run categorical case, you know, I think, I understand that this is the first time this has come before you all in the Eighth Circuit, and I think that's why we cited Mathis, because a categorical case really helps you center and anchor a mine run case, because you have to look at the elements, you have to look at what is required for a case, and loss is not required, and loss is not required, and then if there is something above that, the guidelines takes that into account with the factor. It's literally a typical case, because it's accounted for in the guidelines, and if you want to deviate beyond that, you must, there must be some aggravating feature that is present in some substantial way to show why that this case deserved to be increased by 600 percent, and that's where we were getting at with that reason. Counsel, if the court had found that the approximate loss of 17 million in share in sales that DuPont suffered was a reasonable estimate, what would the guideline range have been? Off the top of my head, I do not know that, your honor. We could remand and have the district court articulate that. Forty-two months might be a downward variance. What we've actually asked for is that we remand, so the court can explain that very point, because that's what we're saying, there's an inconsistency in the court's reasoning when it says that there was no loss. But didn't you say there was no loss, counsel? I apologize, I apologize. When the court says it was unable to calculate a loss above $5,000, incalculable above that amount, and she was focusing specifically on gain or loss figures, I understand there could be other intangible harms. For example, she mentioned that they were harmed financially, and that the customers left DuPont because of the misappropriation of trade secrets. Our point was like that was not mentioned, and that was not proven by the government. And the government even notes that in its brief, they note that there was no causal connection between the departure of the customers and Mr. Eisner's misappropriation. I'm over time, and I can continue if you'd like, but I don't want to take up any additional time right now. Thank you. Mr. Murphy? Yes, Your Honor. May it please the court. Judge Loken, we absolutely agree that this case comes down to whether or not the sentence was substantively reasonable. We disagree with the points that were briefed in this matter about the court's findings not being supported, and we can certainly address that. But if I could, I'd like to just briefly address some of the offense conduct here that's undisputed, that underlies the court's decision in our view. The defendant signed a nondisclosure agreement with DuPont in February of 2013 when he was hired. In late July, the competitor employee said, we're ready to bring you on board. They'd never even met the guy or interviewed him, according to the records. And they increased his salary from $80,000 to $110,000 immediately, going up to $115,000. And on that same day, they're telling him he's going to get a new car with leather and all this stuff, and they tell him he's going to be in charge of two major accounts, two accounts that were major accounts to DuPont. And we refer to them as P1, that's Plant 1 and Plant 2. It's Nugent and Theralton. So I'll refer to the P1, P2, and so forth are references so that we could keep the names of the victim companies protected. So they immediately tell him he's still working for DuPont. He hasn't even given them a notice that he's leaving. They tell him that he's going to be in charge of these two significant accounts. They tell him he's going to be overseeing a couple other accounts that are also accounts of DuPont, and the defendant responds, great. Have you seen any baseline data from any of these plants? Let me see what I can before I can't. You've got the bull by the horns to this corporate employee of the new company, and you're going to put some life back in the industry. This is at PSR, the paragraph 35. And if this guy tells him that the COO of the company gives him more secret information about their company, about other clients that they have, and then the next day the defendant submits a resignation letter. On August 12th, the COO sends more information to the defendant, and on August 15th, the defendant sends DuPont's personal trade secret information concerning some of these accounts to the competitor employee. This is the COO's counsel, the COO. Is this of DuPont or of the competitor? I'm sorry, the competitor company. CTE. Yes. So he's sending him already, he's sending him DuPont's information. He still hasn't left DuPont. He's not leaving DuPont until August 23rd. And these two guys are at the ballpark, the COO and another corporate exec. And the competitor, and he says, these may be of use to you. If you're not comfortable viewing these, I understand. Let me know. And one guy responds, if you're okay with it, I'm certainly okay with it. Are we going to have some fun or what? And the defendant responds, you better believe it. And then he emails several documents pertaining to P1 and P2, the bigger customers, and several other clients of DuPont, including information concerning what we refer to as product A. It was a product that was under development by DuPont. It was a pre-commercial product. And he's sending this to the competitor. And the defendant asks, he sends this stuff and he asks the corporate employee, anything specific? In other words, you want anything else, anything specific? He sends him more files within the next few days. And over the course of about a week, he downloads several hundred of DuPont's files pertaining to its products, its pricing, its testing, its yield information, all this stuff. And he's given more information by the competitor employee. On August 16th, he sends him information from DuPont relating, or the competitor company, relating to other customers of theirs. He sends him more information concerning customers that the competitor company is telling him about. And then when the defendant says, I'm going to turn in my company phone to DuPont, the COO says, be sure to erase all text with me before giving the phone back. They know what's going on is wrong. They're only too happy to hire this guy, to apply him. He was underperforming employee with DuPont. They never checked any references with DuPont on him. They give him a significant pay raise, a car with leather seats, all this stuff, before he's ever even on board. And they start his compensation a week before he comes on board with this competitor company. They are playing this guy and he's feeding the information right to them the way they want. There's a search warrant on November 8th. And then they send a lawyer gets involved and the defendant sends an email to the competitor employee. So he left DuPont on August 23rd. He tells DuPont, no, I never took any information. I understand my confidentiality. I can't disclose any of this stuff. I wouldn't take anything from DuPont. He goes with the new information. And then on November 12th, after lawyers get involved, he says beating DuPont again. He tells the COO, beating DuPont again, if that can happen, would send another message. So in other words, they're beating DuPont. That's what this is all about. And then on November 14th, he's placed on administrative leave with full benefits and pay. And I submit that's an action to try to cover the tail of the corporate executives. On December 30th, the company sends him a letter, which purports to say they have no interest in stolen information. And by gosh, if the guy has stolen any information, they don't want it. And they would discharge him if they ever found that out. All along, the COO has been receiving stolen information and using it. So the defendant admits here, and this is undisputed in the record, it's admitted in the plea agreement and the pre-sentence report that he knew DuPont's pricing information was secret. He knew if it was disclosed to the competitor, the competitor would have advantage where they needed to price their product to compete with DuPont. He knew the information he took had economic value. That's in the sentencing transcript at page 54, 28, the evidentiary transcript. He was also aware of product A, this product that was in development. He also understood, according to the plea agreement, paragraph 15P, if he was effective in his job, the new company could increase its business and DuPont would lose business. And despite this, he also agreed that he was using DuPont's information to compare and help set prices for the competitor's products even before he left DuPont's employment. That's at the pre-sentence report, paragraph 68. And he also continued to do so after he left DuPont. That's shown by paragraphs 75 and 76. What this all comes down to is, we frankly admitted that DuPont could not attribute a particular value to the information that was stolen. But as the probation office recommended, a departure upward, above guidelines. Counsel, is it in the record, the context in which DuPont so advised? In other words, was that a discussion as to a claim for restitution? Or was it the government asking DuPont for input on loss for sentencing purposes? We asked them... Does the record reflect that? The record reflects, I'm not certain I'm understanding completely the court's question. The record reflects testimony from DuPont's marketing manager about the loss that they sustained. And government's exhibit six goes back to January of 2012 up to essentially the time that they began to sustain loss. And that just shows loss for two clients. The testimony in the record is... You haven't answered my question. Was DuPont declining to put in a claim for restitution because of the valuation difficulty? Or were they telling the government, for loss purposes, we don't have a clue? That wouldn't have been DuPont's perspective. Frankly, your honor, the issue of restitution was never raised by their client or by their counsel. They never sought restitution. They were most content with getting out the fact that there was punishment for this type of conduct. They've suffered similar types of thefts before. This is very difficult to calculate. As they say... And they were quite open. They could not attribute a specific amount of loss to the defendant. But as to these two particular clients, on an annualized basis, they show what the loss in sales were. In other words, they were doing business with these two customers, and particularly with the first one, P1, month after month after month. And then all of a sudden, a month after the defendant leaves, a month and a half after he leaves, boom, no more business for the next four years, five years. So given everything else that the defendant says and admits, that he knew that there was value here, that he knew that this could be used, the fact that he was using it, they believe that absolutely the defendant had something to do with it. But just candidly, they can't say we can attribute X dollars particularly to the defendant's conduct. So the court did not... The court said that there was... The DuPont lost customers. It certainly did not find a specific amount of loss. But that was one factor also in the court's decision here. The court listed... I counted about 25 different... I'm still where I was. I find it remarkable that DuPont never... Frankly, incredible that DuPont never considered requesting restitution in a situation where you have a lot of resources in the hands of the bad guys, so to speak. So where in the record does it establish that DuPont never... I'm sure they never filed a claim, but is it in the record that they never even talked about it? It's not in the record as to whether they talked about it or... I bet you can't say because... I bet you can't say that with any confidence. I can say with confidence that it is not in the record, anything with regards to restitution, whether they saw it or didn't seek it. I mean, the fact of the matter is they did not seek it, so that's in the record, absence in the record of... Wait, wait, they didn't put in a claim. They did not put in a claim. In my experience in fraud cases, your counterparts in the Justice Department are running around looking for restitution claimants all the time, and I can't believe that there wasn't some of that here. Well, all I can tell you is... The record's silent. The record's silent, but what you're saying does not ring true to me, what you're asserting. Well, all I can say, Your Honor, is I was the with them. It was not an issue that we ever breached. Did the probation officer contact them first, or did the probation officer get its information from the prosecution team? Well, I don't know if the probation office contacted DuPont, but DuPont contacted the FBI when they first discovered this loss, and that's why there was a search of the defendant's residence. So DuPont contacted the FBI very early on, and that's what precipitated this investigation. I don't know. Do you have further questions in that area, Your Honor? It's just... If there had been a restitution claim granted on this level, with this level of known knowledge, I'd have a great deal of trouble here, but lost for sentencing purposes is such a different inquiry, but that's why I wanted to distinguish what we were dealing with. Yes, and there was extensive, fair amount of discussion about the various types of loss here. I mean, it wasn't just loss in sales. There's also other ways to calculate loss, and frankly, there were other things such as loss in goodwill, trust with other companies, things like that. The intended loss was probably the $17 million. It could well have exceeded that, but that's all we put evidence on about just with regards to two customers, which we thought were the most obvious, but there were others, as the record shows, there were others as well. I think I'm out of time. Does the court have other questions? Very good. Thank you. Thank you, Mr. Silber. I think you have some time for rebuttal. Apologies. I was talking on mute. Sorry about that. Yes, Your Honor. I actually want to start with where Judge Erickson and I left off because I think he said the most important thing was whether or not this was a—the issue that this is going to come down to is whether this was an unreasonable sentence under the guidelines, and it's our position that the 3553A guidelines can't be used as an excuse to increase a sentence based on a criminal history that has no similarity to the incident of offense. All the factors, the lying to the FBI, for example, was already accounted for in the guidelines, and this court has said in the United States v. Robertson that that doesn't make the case unusual or deserving of increased punishment because that's to be expected. All of the speeding tickets, all of the other prior offenses were already calculated into the criminal history. They were already—Mr. Eisen was already punished for that conduct. When it comes to 3553A6, the court is supposed to make sure that it doesn't increase sentence disparities, but relying on a mine run typical offense, which is what this is, relying on that typical offense and then looking at criminal history is only going to exacerbate sentencing disparities because you'll have people with the same baseline offense who are only getting different sentences based on conduct that happened, in this case, almost three decades ago. That will only increase sentencing disparities moving forward. That's what the Sixth Circuit was explaining in those cases before, which is why I reported them to you, and as the child counsel explained, that is why without the showing of loss by the government beyond the $5,000 loss under the guidelines, the reasonable typical sentence that was sufficient was the sentence that was zero to six months. We just believe that there was not a sufficient explanation of aggravating circumstances that were not taken into consideration beyond that, and it's for that reason that we think remand is necessary so the court can further explain its sentence, explain its disagreement with the guidelines, so that we can address these issues on remand. Do I have any further questions? Very good, counsel.